IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

BARBARA S. COFFINDAFFER,

     Plaintiff,

v.                        CASE NO. 2:08-cv-0940

MICHAEL J. ASTRUE,
Commissioner of Social Security,

     Defendant.


## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. This case was referred to this United States Magistrate Judge by standing order to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are briefs in support of judgment on the pleadings.

Plaintiff, Barbara S. Coffindaffer (hereinafter referred to as "Claimant"), filed an application for DIB on April 13, 2005, alleging disability as of January 1, 2002, due to chronic congestive pulmonary disease, irritable bowel syndrome, bladder and kidney problems, high blood pressure, diabetes, arthritis, and insomnia. (Tr. at 18, 70-72, 87-94.) The claim was denied

initially and upon reconsideration.  (Tr. at 18, 59, 63.)  On April 24, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 58.)  The hearing was held on December 13, 2006 before the Honorable James P. Troschi.  (Tr. at 30, 37-51.) By decision dated January 26, 2007, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 18-25.)  The ALJ's decision became the final decision of the Commissioner on May 29, 2008, when the Appeals Council denied Claimant's request for review.  (Tr. at 6-9.)  On July 22, 2008, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. § 404.1520 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. § 404.1520(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. § 404.1520(b).  If

the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 404.1520(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she has not engaged in

substantial gainful activity since the alleged onset date.  (Tr. at 20.)  Under the second inquiry, the ALJ found that Claimant suffers from the severe impairment of arthroscopy of the knee.  (Tr. at 20-21.)  At the third inquiry, the ALJ concluded that Claimant's impairment does not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 22.)  The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations.  (Tr. at 22-24.)  As a result, Claimant could return to her past relevant work.  (Tr. at 24.)  The ALJ concluded that Claimant could perform her past relevant work as a secretary, a job which exists in significant numbers in the national economy.  (Tr. at 24.)  On this basis, benefits were denied.  (Tr. at 25.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.  In Blalock v. Richardson, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Cellebreze, 368 F.2d 640, 642 (4th Cir. 1966)).

Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."  Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner in this case is supported by substantial evidence.

Claimant's Background

Claimant was sixty-two years old at the time of the administrative hearing.  (Tr. at 40.)  She has a high school education.  (Tr. at 41.)  She did not have special education classes for a learning disability.  (Tr. at 41.)  In the past, she worked as a secretary/clerical worker for Union Carbide for thirty-one years.  (Tr. at 48.)  She worked in a supervisory position and received specialized training in computers.  (Tr. at 41, 48.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will discuss it further below as necessary.

Physical Evidence

Records indicate Muhib S. Tarakji, M.D. treated Claimant from March 17, 1999 to July 5, 2006 for vision care.  (Tr. at 392-404.)

5

The handwritten notes are mostly illegible. However, notes dated March 9, 2005, clearly state "OTC [over the counter] readers...patient states no change in vision - only uses reading classes - does O.K. this way." (Tr. at 393.)

Records indicate Utaiwan Suvannoparat, M.D. treated Claimant from December 27, 2001 to January 13, 2006. (Tr. at 268-350.) The handwritten notes, mostly illegible, indicate Claimant saw Dr. Suvannoparat for a variety of primary care issues and prescription refills.

Records indicate that Claimant was treated at Charleston Renal Group/Renal Consultants from September 16, 2002 to September 18, 2006 for nephrology and hypertension. (Tr. at 162-83, 441-505.) Treatment forms indicate Claimant is "retired" (Tr. at 163, 166, 169, 447, 449, 456.) Although most of the handwritten parts of the forms are illegible, office exam notes dated March 29, 2004 and September 20, 2004 are legible and indicate "HTN [hypertension] - Benign - controlled." (Tr. at 165, 168, 450.) A renal ultrasound dated September 26, 2002, states: "Kidneys appear within normal limits. No cysts, mass, hydro or stones at this time." (Tr. at 496.) Many of the records indicate medication management and prescription refills. (Tr. at 162-83, 441-59.)

On August 28, 2003, Claimant underwent an examination at Capital City Chiropractic. (Tr. at 148-52.) The unsigned forms indicate that claimant is "retired" and was evaluated for

"stiffness, pain in joints." (Tr. at 152.) A form labeled "Myofascial Release Therapy" indicates claimant was treated twice including a "paraffin dip on feet." (Tr. at 153.)

On September 12, 2003, Harry E. Duncan, Jr., M.D. wrote that Claimant underwent a

> colonoscopy to investigate her six year history of ongoing chronic diarrhea. I was able to complete the procedure through the cecum with no findings suggestive of inflammation, polyps or other lesion. I did obtain biopsies from her right colon to rule out "microscopic" colitis as well as fluid studies to determine if parasites are present...Fortunately, there appears to be no evidence of a neoplastic lesion or obvious inflammatory changes in the lower gastrointestinal tract.

(Tr. at 155.)

On September 15, 2003, David A. Hansen, M.D. reported to Dr. Duncan regarding Claimant's colon biopsies. Dr. Hansen's diagnosis: "Colonic mucosa showing mildly increased chronic inflammation with the lamina propria and a few scattered lymphoid aggregates; no active colitis, dysplasia or neoplasia identified." (Tr. at 157, 255.)

On September 15, 2003, Raghda Sahloul, M.D., saw Claimant for a consultative examination for uncontrolled diabetes. (Tr. at 191-94.) Dr. Sahloul stated:

> This is a 59-year old lady who was diagnosed with diabetes type II seven years ago. She was put on Lantus recently. Blood sugar has been uncontrolled. Patient checks her blood sugar only periodically...She is under stress. She smokes two packs per day, which she loves and she is not planning to cut down on. She saw an opthalmologist. She had cataract surgery with implants, but no retinopathy. No nerve damage in her feet.

7

(Tr. at 192.)

Treatment notes indicate claimant was treated for diabetes by Dr. Sahloul on four occasions from October 15, 2003 to May 12, 2005.  (Tr. at 187-90.)  In a letter dated May 18, 2005, Dr. Sahloul stated: "Ms. Coffindaffer is a 61 year old female with a history of Diabetes.  I see her specifically for Diabetes and have no opinion concerning her disability."  (Tr. at 186.)

On September 19, 2003, George Zaldivar, M.D., a specialist in pulmonary medicine and sleep disorder, evaluated Claimant upon referral from Dr. Suvannoparat. (Tr. at 239-41.)  Dr. Zaldivar noted that Claimant was retired, smoked two packs of cigarettes per day, and drank six cups of coffee per day.  (Tr. at 239.)  He concluded:

> I spoke to her at great length about the necessity of quitting smoking.  I offered her Wellbutin.  She said she had taken it in the past.  Because the Wellbutin caused the cigarettes to taste bad she got rid of the Wellbutin. I advised her not to use nicotine patches as long as she is smoking or else she would suffer an overdose of nicotine.  I recommended a smoke cessation program but she was not interested.

(Tr. at 241.)

Treatment notes indicate Claimant was treated by Dr. Zaldivar, M.D. on fourteen occasions from October 13, 2003 to October 23, 2006.  (Tr. at 220-41, 531-547.)  Although the handwritten notes are largely illegible, a typed report dated December 1, 2003 states: "She still smokes 1-1/2 packs of cigarettes per day and

8

still has a great deal of bronchitis as well as wheezing, which suggests asthma even though no asthma was found by previous breathing tests as Charleston Area Medical Center." (Tr. at 231.) Another typed report dated December 7, 2005 states: "Ms. Coffindaffer continues to smoke.  She continues to have episodes of bronchospasm, which at the time she was in my office on 12/05/2005, required the use of Prednisone." (Tr. at 221.)  The report dated October 23, 2006 states: "Chief complaints: Smokes...still has wheezes.  Now on O2 [oxygen]." (Tr. at 547.)

Dr. Zaldivar reviewed PA and lateral view x-rays dated January 13, 2004 and October 15, 2003.  (Tr. at 228, 233.) In the earlier x-ray, he found Claimant's "heart is of normal size... There is no mass lesion seen nor pneumonia.  She has chronic bronchitis." (Tr. at 233.) In the more recent x-ray, he found: "The heart is normal in size...Diffuse inflammatory changes particularly in the left lung with some on the right, produced by acute exacerbation of bronchitis and bronchospasm." (Tr. at 228.)

Records indicate Claimant was treated nine times for diabetes by Raghda Sahloul, M.D. from October 15, 2003 to September 25, 2006. (Tr. at 410-36.) The handwritten notes are illegible.  The report dated September 15, 2003, found at page 419 of the transcript is a duplicate of the report at page 192.

On March 9, 2004, H. S. Ramesh, M.D. did a consultative evaluation of claimant at the referral of Dr. Utaiwan Suvannoparat

due to claimant's complaints of neck pain following a rear end car collision on March 2, 2004. (Tr. at 158-61.) Dr. Ramesh's impression was cervical strain/sprain, cervical facet syndrome, degenerative joint disease, diabetes mellitus II, and pyelonephritis. He recommended "[p]hysical therapy 3 times per week for 4-6 weeks... Issue a TENS unit for pain management." (Tr. at 161.)

On October 21, 2004 and May 4, 2005, Claimant underwent testing at South Charleston Cardiodiagnostics upon referral from Dr. Suvannoparat due to Claimant's chest pain. Claimant's risk factors were listed as diabetes, hypertension, and tobacco use. (Tr. at 184.) R. K. Gogineni, M.D. interpreted a carotid duplex exam: "Plaque morphology: Intimal layer thickening bilateral common carotid arteries. Mild homogeneous calcified plaque bilateral carotid bifurcations. No evidence of significant stenosis identified in the internal carotid arteries. No significant stenosis in the external carotid arteries bilaterally. Antegrade flow in both vertebral arteries. Normal flow in both subclavian arteries." (Tr. at 184.) M. B. Yousaf, M.D. interpreted a treadmill stress test and concluded:

> SPECT Tomographic Images:
> The post stress SPECT images reveal normal perfusion of all of the walls of the left ventricular myocardium with normal uptakes of Thallium 201 on the resting Thallium images. This is consistent with a negative exercise stress test for ischemia using dual isotope.
> Gated SPECT: All the walls of the left ventricle contract normally. There are no regional wall motion

10

abnormalities...
<u>Conclusion</u>: 1) Normal perfusion of all the walls of the
left ventricular myocardium suggesting no ischemia.
2) No regional wall motion abnormalities.
3) L.V.Ej.Fr. OF 61%.
4) Negative exercise EKG.

(Tr. at 185.)

On August 30, 2005, Kip Beard, M.D. performed an Internal
Medicine Consultative Examination of Claimant. (Tr. at 195-204.)

Dr. Beard concluded:

The claimant is a 61-year old female with history of type
II diabetes. Examination today reveals no appreciable
end organ damage associated with diabetes. The claimant
does report having had some symptoms she referred to as
a stroke. Neurologic exam revealed no appreciable
clinical evidence of stroke. She also has a history of
chronic lung problems. The lungs do reveal moderate
wheezes and rhonchi and a mild degree of dyspnea on
exertion without clubbing or cyanosis. She also has a
history of chronic joint pain. Examination today reveals
some joint crepitation and some mild motion abnormalities
consistent with osteoarthritis and also some
abnormalities with pain and tenderness in the lower back
without evidence of radiculopathy. The claimant's gait
was normal, and she required no ambulatory aids.
Regarding irritable bowel syndrome, there is some mild
diffuse tenderness of the abdomen. The abdomen was
nondistended and nonacute.

(Tr. at 199-200.)

On September 21, 2005, a State agency medical source completed
a Physical Residual Functional Capacity Assessment ("PRFC") and
opined that claimant could perform light work with the ability to
occasionally climb ramp/stairs, stoop, kneel, crouch, and an
inability to climb ladder/rope/scaffolds and balance. (Tr. at 205-
12.) The evaluator found no manipulative, visual, or communicative

11

limitations.   Environmental limitations were unlimited except to avoid vibration, fumes, odors, dusts, gases, poor ventilation, etc, and hazards. (Tr. at 205-09.)   The evaluator, Gomez A. Rafael, M.D., noted:

> Patient is not fully credible.  Some of her allegations are not supported by the medical findings.  She said she had stroke with balance problem.  However a neurological exam including gait is normal.  She has multiple arthralgias without any evidence of inflammatory arthritis.  Has diabetes and HTN [hypertension] under control.  She is reduced to light work with postural limitations.

(Tr. at 210.)

Treatment notes indicate Kazmi Samina, M.D. treated Claimant during four office visits dated November 7, 2005, September 21, 2005, January 4, 2006 and February 13, 2006.  (Tr. at 351-62.) The handwritten notes for February 13, 2006 are illegible.  (Tr. at 351.) The handwritten notes for January 4, 2006, are largely illegible. However, the legible part states: "No symptoms suggestive TIA/Stroke. Occasional unsteady.  Memory seen about the same." (Tr. at 252.)  The handwritten notes for November 7, 2005, are largely illegible.  However, the legible part states: "Hard time remembering peoples names.  Has been going on since last year." (Tr. at 353.) The handwritten notes for September 21, 2005 are illegible.  (Tr. at 362.)

On October 13, 2005, Claimant underwent an MRA of her head at CAMC due to reported "slurred speech, headaches, dizziness." (Tr. at 243.)   John F. Mega, M.D. reported: "MRA of the cerebral

vasculature was performed. Normal antegrade flow is demonstrated about the vessels comprising the circle of Willis. There is no evidence of aneurysm or arterivenous malformation. IMPRESSION: Normal MRA of the cerebral vasculature." (Tr. at 243, 332, 355.)

On October 13, 2005, Claimant also underwent an MRI of her brain at CAMC. John Anton, M.D. reported: "Old ischemic changes. There is no evidence for acute hemorrhage, infarction or mass." (Tr. at 244, 331, 354.)

On October 13, 2005, Claimant also underwent an echocardiogram at CAMC. The tech concluded: "The left ventricle is normal in size, but decreased in systolic function... There are no intracardiac masses and no effusions." (Tr. at 245.)

On November 14, 2005 and November 22, 2005, Claimant underwent nuclear stress tests at Stanton Cardiology Center. (Tr. at 213-19.) In a report dated November 22, 2005, Brad McCoy, D.O. concluded:

> A nuclear stress test was done in the office today. The results are pending at the time of this dictation. The resting EKG sinus rhythm and was within normal limits. During the exercise portion of the test there were no significant ST T changes. No arrhythmias were noted. No chest pain was elicited.

(Tr. at 214.)

On November 22, 2005, H. James Stanton, M.D. interpreted Claimant's nuclear stress test results:

> Findings:
> On the post exercise images all areas of the myocardium appeared to perfuse adequately. There are no perfusion

13

defects detected. On the rest images no areas of reperfusion were noted. A relative decrease in perfusion in the inferior wall which appeared to be a normal variant which did not change on the rest images was noted. On the gated study all segments of the left ventricle including the inferior wall contracted and thickened normally with a 56% EJ [ejection fraction].
Conclusions:
1. No evidence of exercise induced ischemia or previous infarction was detected on this study.
2. Normal left ventricular contractility with a 56% ejection fraction.
3. The EKG portion of the study was negative for ischemia.

(Tr. at 215.)

On January 10, 2006, Samina Kazmi, M.D. interpreted a neurodiagnostic study of Claimant due to Claimant's reported "episodic staring spell":

REPORT: This is a digitally acquired adult EEG following standard 10-20 system of electrode placement. The best background activity identified during the recording was 8-9 Hz which was of very low amplitude, poorly formed however, was reactive to eye opening and stimulation. Hyperventilation and photic stimulation was performed, which did not reproduce any abnormality. No clear sleep architectures were seen. EKG monitoring lead showed a heart rate of 90-100 beats per minute, which was regular.

INTERPRETATION: This is a normal adult awake EEG. Clinical correlation and normal EEG does not rule out seizure. If that is still a concern, a sleep deprived EEG with prolonged recording would be helpful. Clinical correlation is also required.

(Tr. at 242.)

On March 21, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment ("PRFC") and opined that claimant could perform light work with the ability to occasionally climb ramp/stairs and stoop, but not climb

14

ladder/rope/scaffolds, balance, kneel, crouch, or crawl. (Tr. at 370-72.)    The evaluator found no manipulative, visual, or communicative limitations.    Environmental limitations were unlimited except to avoid extreme temperatures, vibration, fumes, odors, dusts, gases, poor ventilation, etc., and hazards. (Tr. at 373-74.)  The evaluator, Marcell Lambrechts, M.D., noted:

> This claimant has mild to moderate COPD and still smokes despite advice.  She has type 2 diabetes that is controlled by her TP.  She has a family history of CAD. She had an EKG that was not significant and a ECHO that revealed mild cardiomyopathy.  Her EF was 56% in 11/05. There are no new findings besides what is mentioned.  She is only partly credible and she does not seem to follow medical advices.  RFC is reduced as noted.

(Tr. at 375.)

Treatment notes indicate Claimant was treated by Sandra S. Brannin, D.O. on May 25, 2006, June 28, 2006, August 4, 2006, and August 21, 2006.  (Tr. at 506-26.) In her notes dated August 21, 2006, Dr. Brannin states:

> The patient is a 62 year old white female who has a history of hypertension, diabetes, hyperlipidemia, and COPD. Her blood pressure has been well controlled on the patient's current medications.  Her blood sugars have been fairly well controlled on insulin.  The patient's LDL levels have been well controlled on the patient's current medication regimen.  The patient's obstructive pulmonary disease has been stable on the patient's current medical regimen.  She reports she is breathing better since on her oxygen.  The patient denies chest pain, dyspnea, syncope, and palpitations...The patient also reports bilateral knee pain.  The symptoms developed 2 years ago...She states that this pain was not precipitated by injury and trauma.  The pain seems to get better with heat and darvocet and is made worse with use.

(Tr. at 506.)

15

Dr. Brannin ordered x-rays of Claimant's knees.  On August 21, 2006, Michael E. Anton, M.D. made this interpretation of claimant's left knee: "Overall, there is normal mineralization.  There is normal alignment.  No fracture is noted.  There is mild medial compartment narrowing."  (Tr. at 555.)   On August 26, 2006, Dr. Anton made this interpretation of claimant's right knee:  "Overall, there is normal mineralization.  There is normal alignment.  No fracture is noted.  There are mild medial compartment degenerative changes."  (Tr. at 553.)

Treatment notes indicate Claimant was treated by Robert L. Ghiz, M.D. on September 6, 2006 and October 25, 2006 for bilateral knee pain.  (Tr. at 437-40.) Dr. Ghiz noted on September 6, 2006: "She walks without a limp.  She has equal quadriceps size.  She has full ROM of both knees.  There is no fluid in either knee...I ordered physical therapy for stretching exercises to both knees, quadriceps, three times a week for 4 weeks." (Tr. at 439-40.)   On October 25, 2006, Dr. Ghiz noted:

> The patient took her physical therapy.  She is much better.  She took it for about three times a week for four weeks.  They gave her a home program but she is not following it.  She still has some pain but she is improved... Exam shows that she does have pain under the medial and lateral facets of both patella.  There is no fluid in either knee.  There is full range of motion of both knees and Lachman's test and drawer sign is negative bilaterally.  There is no McMurray's sign on either side. Assessment: 1. Patellar Malalignment Syndrome - 719.96 (primary), bilateral... I instructed her on terminal extension, quad strengthening exercises and instructed her on quad stretching exercises.  She is discharged to return prn.  Her quads are still very tight in spite of

16

the fact we prescribed that in the physical therapy.  I don't think she is doing her home program.

(Tr. at 437.)

On December 5, 2006, Dr. Brannin provided a Medical Assessment of Ability to do Work-Related Activities. Dr. Brannin opined that Claimant could lift or carry ten pounds for up to one third of an 8-hour day and five pounds for one third to two thirds of an 8-hour day; stand and/or walk for three hours of an 8-hour work day or five minutes without interruption; and sit for three hours without interruption.  She found Claimant could occasionally balance but never climb, stoop, crouch, kneel, or crawl.  She found claimant had environmental restrictions for temperature extremes, chemicals, dust, fumes and humidity; manipulation limitations in reaching, handling, fingering, and feeling ["cannot do over long period of time"]; and no limitations regarding visual/communication. (Tr. at 527-29.)

On December 18, 2006, Chad C. Turner, M.D. treated Claimant for "a decompensation of her COPD...The apparent reason for decompensation: medication non-compliance and URI with bronchitis...active smoker." (Tr. at 549.)  Dr. Turner ordered a chest two view x-ray on the same date which Timothy A. Conner, M.D. interpreted as: "There is chronic interstitial fibrosis, unchanged from August 4, 2006.  The lung fields are otherwise clear.  The heart is normal size.  Impression: No acute processes."  (Tr. at 552.)

17

Psychiatric Evidence

On March 6, 2005, Tracy Smith, M.A., licensed psychologist, provided a Neuropsychological Profile of Claimant for the West Virginia Disability Determination Service.  (Tr. at 363-69.)  Ms. Smith describes Claimant as "retired three years ago."  (Tr. at 364.)  Ms. Smith found:

> Mental Status Examination: Appearance: The claimant had adequate personal hygiene and casual dress for appointment.  Attitude/Behavior: The claimant was cooperative and pleasant with the examiner and staff. Social: The claimant had good interaction and good eye contact and spontaneous generation of conversation. Speech: The claimant's speech was relevant and coherent. Orientation: The claimant was oriented x4.  Mood: The claimant's observed mood was somewhat depressed.  Affect: Labile, as evidenced by tearfulness at times discussing her medical problems.  Thought Process: Within normal limits.  Thought Content: Within normal limits. Perceptual: Within normal limits.  Insight: Within normal limits.  Judgment: Average as evidenced by a scaled standard score of 8 on the Comprehension subtest of the WAIS-III.  Suicidal/Homicidal Ideation: The claimant has reported a history of suicidal ideations and plan due to depression without any intent.  She does commit to safety at this time for herself and others.  Immediate Memory: Within normal limits as evidenced by her immediate recall of four of four words.  Recent Memory: Recent memory was markedly deficient as evidenced by delayed recall of zero of four words after 10 minutes.  Remote Memory: Within normal limits.  Concentration: Average as evidenced by a scaled standard score of 9 on the digit span subtest of the WAIS-III.  Psychomotor Behavior: The claimant presented wringing of her hands and fidgeting throughout the initial assessment...
> Intellectual Assessment:
> WAIS-III:...
> | IQ Scale | Score |
> | --- | --- |
> | Verbal IQ | 92 |
> | Performance IQ | 84 |
> | Full Scale IQ | 88... |
> WAIS-Validity: The claimant appeared to provide adequate effort during her psychological testing portion of the

examination; therefore, results are considered to be valid.  The results received are considered to be a valid interpretation of her current intellectual potential and consistent with previous academic record...

Diagnostic Impression (DSM-IV Diagnoses):

Axis I     309.0      Adjustment disorder with depressed
                      mood, chronic

Axis II    V71.09     No diagnosis

Axis III              Diabetes
                      Irritable bowel syndrome
                      Kidney problems
                      High blood pressure
                      Arthritis
                      (By claimant's report only).

Prognosis: Fair
Daily Activities: Typical Day: The claimant wakes at 10 a.m., fixes herself something to eat, takes her medication and breathing treatments, watches television, lays in the bed to do so.  She fixes something if her husband is not home and goes to bed around 11 p.m. and is up and down throughout the night.  Activities List: The claimant is able to fix her own light food.  She does laundry, takes care of her dog and plants and handles finances.
Social Functioning: During the Evaluation: Within normal limits, as evidenced by ability to interact adequately with examiner and staff.  Reported Social Activities: The claimant goes to lunch one time a month with her former coworkers and goes to the store occasionally without assistance.

Persistence: The claimant had adequate ability to stay on task.

Pace: Within normal limits, as evidenced by her ability to remain on task and complete work without multiple redirection.

Capability: If granted benefits, it is felt that this claimant would be capable of managing her own finances.

(Tr. at 365-68.)

19

Progress notes dated March 1, 2006 to July 20, 2006, indicate Claimant was treated by Mark N. Casdorph, D.O., Family Psychiatric Services, five times.  The handwritten notes are almost entirely illegible.  However, each report clearly states Claimant is being treated for dysthymia. (Tr. at 405-09.)

On March 24, 2006, a State agency medical source completed a Psychiatric Review Technique form and opined that Claimant had affective disorders with "impairment(s) not severe." (Tr. at 378.) Claimant was found to have an "adjustment disorder." (Tr. at 381.) Claimant had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and no episodes of decompensation.  (Tr. at 388.)  The evidence did not establish the presence of "C" criteria.  (Tr. at 389.)   The evaluator, Rosemary L. Smith, Psy. D., noted: "Claimant is not credible re: her allegations on the ADL [activities of daily living] form.  The results of the CE and her ADL's do not support significant limitations.  Non-severe." (Tr. at 390.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ (1) failed to properly assess Claimant's credibility and to pose a complete hypothetical question; and (2) failed to consider the combined effects of Claimant's impairments.  (Pl.'s Br. at 2-10.)

The Commissioner argues that the ALJ's findings are supported by substantial evidence and should be affirmed because the medical evidence supports the ALJ's conclusion that Claimant was not disabled on or before January 26, 2007 and that the medical evidence did not corroborate Claimant's complaints of disabling functional limitations. (Def.'s Br. at 8-13.)

Credibility

Claimant first asserts the ALJ erred in assessing Claimant's credibility and in posing a complete hypothetical question. (P. Br. At 4-8.)   Specifically, Claimant argues

> The Decision contains a credibility assessment, which
> discounts Ms. Coffindaffer's symptoms and the resulting
> limitations.   It fails to apply the regulatory factors
> set forth in SSR 96-7p and 20 C.F.R. § 404.1529 and makes
> a conclusory credibility finding in violation of SSR 96-
> 7p.   The Decision includes reversible error as it relies
> upon an incomplete hypothetical question to the VE, which
> did not include consideration of Ms. Coffindaffer's need
> to lie down during the day, her marked recent memory
> limitations, and Adjustment Disorder.   When a properly
> all-inclusive question was posed to the VE by the
> representative, she appropriately responded with no jobs.

(Pl.'s Br. at 4.)

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding

about the credibility of the individual's statements.  The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while Claimant's arthroscopy of the knee was a severe impairment, she retained the functional capacity to perform her past relevant work as a secretary as that job is generally performed in the national economy, i.e. sedentary exertional level. (Tr. at 24)  He reasoned that Claimant's complaints were inconsistent with the objective

medical evidence. (Tr. at 20-24.)

The ALJ found:

The undersigned finds that the claimant has not produced evidence of mental, breathing (pulmonary) or headaches/memory (neurological). However, her knee impairment could reasonably be expected to cause the type of pain she alleges. Complaints regarding the knee impairment suggest a greater severity of impairment that can be shown by the objective medical evidence alone. Therefore, the undersigned proceeds to the second part of the pain analysis...As previously discussed, the claimant engages in a wide-variety of activities of daily living inconsistent with the restricted lifestyle of a disabled individual. She takes care of her dog, prepares light meals, waters her plants, helps with the laundry, drives, shops and handles money. She has lunch with friends once a month and talks on the telephone (Exhibit 8E, pp. 3-4). The claimant does take one medication for pain, Darvocet, apparently due to her knees. Her treating physician, Dr. Ghiz prescribed physical therapy but he stated that he did not think she had been compliant (Exhibit 20F). George Zaldivar, M.D., a specialist in pulmonary medicine and sleep disorder, saw the claimant on September 19, 2003, for a complaint of night time coughing and shortness of breath. Dr. Zaldivar stated that he had seen the claimant in 1990 and made a diagnosis of periodic limb movement disorder. He had prescribed Sinemet. She had never taken any medication nor did she ever return for follow-up treatment. The claimant was smoking two packs of cigarettes a day. Dr. Zaldivar counseled her at great length regarding the need to quit smoking. He offered Wellbutrin. She had taken it in the past but it made cigarettes taste so bad that she stopped taking the Wellbutrin. Dr. Zaldivar also recommended a smoking cessation program but she was not interested (Exhibit 10F, pp. 20-22). In a letter dated December 1, 2003, Dr. Zaldivar stated that asthma had not been found on previous breathing testing. He again counseled her to quit smoking (Exhibit 10F, p. 12). She is not compliant in control with her diabetes. On November 20, 2003, her blood glucose was 149 with 109 being the normal high level. On September 15, 2004, it was 131 with 99 being high normal (Exhibit 21F, pp. 33, 42). The last glucose test in the record was June 19, 2006 and it showed a glucose level of 188 with 99 being high normal. Her A1C, a test for control of glucose, was 7.2 with a high normal

being 5.7.  This test was conducted on March 16, 2005
(Exhibit 21F, p. 31).  She has failed to follow
prescribed treatment without showing good cause (20
C.F.R. 404.1530).  Therefore, the Administrative Law
Judge finds that the claimant is only partially credible.

(Tr. at 23-24.)

While Claimant disagrees with the ALJ's findings cited above,

the court has reviewed them and Claimant's testimony at the

administrative hearing and finds that the ALJ's credibility

findings are supported by substantial evidence.  The conclusions

drawn by the ALJ are reasonable.  Additionally, Claimant's largely

conservative treatment and the lack of objective medical evidence

supporting her subjective complaints, along with the other factors

identified in SSR 96-7p, all counsel in favor of a finding that

Claimant's subjective complaints are not entirely credible.

The court proposes that the presiding District Judge find that

the ALJ properly weighed Claimant's subjective complaints of pain

and properly assessed Claimant's credibility and the combination of

her impairments, in keeping with the applicable regulations, case

law, and social security ruling ("SSR") and that his findings are

supported by substantial evidence.  20 C.F.R. § 404.1529(b) (2006);

SSR 96-7p, 1996 WL 374186 (July 2, 1996); Craig v. Chater, 76 F.3d

585, 594 (4th Cir. 1996).

The court proposes that the presiding District Judge find that

the hypothetical question posed by the ALJ included those

limitations that were supported by substantial evidence of record.

Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)(While questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record.).  The ALJ's residual functional capacity finding related to Claimant's impairments reflected Claimant's limitations as supported by substantial evidence of record.  These limitations were included in a hypothetical question, and the vocational expert concluded that Claimant could perform her past work.  As noted in the Claimant's argument, Claimant's representative had an opportunity to pose additional hypothetical questions to the vocational expert, and did so.  (Tr. at 50.)  The record clearly shows that the ALJ was present and participating in the re-examination of the vocational expert.  (Tr. at 50.)

Combined Effects

Claimant argues that the ALJ failed to consider the combined effect of her impairments.  (Pl.'s Br. at 8-10.)  Specifically, Claimant argues

> The Decision discredits Ms. Coffindaffer's testimony and allegations of pain and limitations by discrediting her statement that she requires the use of home oxygen and breathing treatments six times per day... the ALJ is not qualified to make a medical finding.  Should there exist a discrepancy in the medical evidence the proper procedure would have been to summon a medical expert. Instead, the ALJ chose to discredit Ms. Coffindaffer's use of oxygen entirely... The ALJ in this case discounted Ms. Coffindaffer's non-exertional limitations and found her not entirely credible simply because she was able to perform certain household duties on a random basis.  Ms.

25

Coffindaffer is not able to perform those duties on a
sustained basis.

(Tr. at 8-9.)

Claimant's argument in regard to "combined effects" is mostly
boilerplate and does not specifically address how this ALJ failed
to consider Claimant's combined impairments.  In fact, this section
of Claimant's argument is primarily about credibility issues, which
were addressed in the previous section.

In regard to Claimant's assertion that the ALJ improperly made
a "medical finding," the court finds this assertion is unfounded.
The ALJ reviewed the medical evidence and concluded: "There is only
one pulmonary function test in the record.  The test does not
indicate the claimant requires oxygen supplementation (Exhibit 7F,
pp. 9, 10).  Additionally, there is no objective medical
documentation in her recent treatment records that she requires
oxygen six times a day (Exhibit 22F)."  (Tr. at 20-21.)  A review
of the record cited by the ALJ confirms his conclusion. (Tr. at
203-04, 506-526.)

The court proposes that the presiding District Judge find that
the ALJ adequately considered Claimant's impairments alone and in
combination in keeping with 20 C.F.R. §§ 404.1523 and 416.923
(2007).  The ALJ's decision reflects a careful consideration of
Claimant's impairments and their combined effect.  In his decision,
the ALJ stated that Claimant's severe knee impairment, both alone
and in combination, including those deemed nonsevere, did not meet

26

or equal a listing. The ALJ found:

An x-ray taken on August 21, 2006 showed degenerative
change of both knees.  This would limit her ability to
stand/walk (Exhibit 22F, p. 5).  The claimant complained
of headaches, but an MRI of the brain taken on October
13, 2005 showed no acute changes (Exhibit 13F, p. 4).  An
EEG taken on January 10, 2006 was normal (Exhibit 11F, p.
10).  Therefore the ALJ finds that the claimant has no
severe neurological impairment.  The claimant alleges
asthma/chronic obstructive pulmonary disease (COPD).  The
ALJ has taken into consideration the allegation that she
takes breathing treatments six times a day (Exhibit 8E,
p. 1).  The ALJ observed the claimant using an oxygen
devise at the hearing.  However, the pulmonary function
studies are the only objective medical testing of lung
functioning.  There is only one pulmonary function test
in this record.  That test does not indicate that the
claimant requires oxygen supplementation (Exhibit 7F, pp.
9-10).  Additionally, there is no objective medical
documentation in her recent treatment records that she
requires oxygen six times a day (Exhibit 22F).  She
alleges a mental impairment of depression. Tracy Smith,
M.A., licensed psychologist and state agency consultant,
conducted a neuropsychological evaluation of the claimant
on March 6, 2006.  The claimant reported that she became
depressed when she lost her job.  On the other hand, Ms.
Smith wrote that the claimant was receiving retirement
benefits.  The claimant has been in outpatient mental
health treatment on two occasions.  Her psychiatrist
prescribed Prozac and Neurontin. Ms. Smith conducted a
cognistat test.  The claimant scored average in every
category.  Ms. Smith diagnosed adjustment disorder with
depressed mood.  Although the claimant may have A
criteria of a severe mental impairment, she does not have
any B criteria.  She engages un a wide variety of
activities of daily living inconsistent with a restricted
lifestyle of an individual with a severe mental
impairment. She has no limitation in activities of daily
living...The evidence does not establish the presence of
the "C" criteria.  Also, a state agency consultant
reviewed the record on March 24, 2006 and opined that the
claimant's alleged affective disorder was not severe
(Exhibit 16F, p. 1).  The ALJ has adopted the
consultant's evaluation of the "B" criteria (Exhibit
16F).  In a letter dated December 18, 2006 addressed to
the ALJ, counsel for the claimant states that a
limitation including "a markedly deficient recently

memory" should have been added as a limitation in the hypothetical posed to the vocational expert (Exhibit 14, p. 3). Any mental limitation would have been appropriate only if the ALJ had found the claimant had any severe mental impairment. As previously discussed, the ALJ has found that the claimant does not have any severe mental impairment. Her score on the recent memory portion of the mental status examination is inconsistent with her average memory score on the cognistat, her activities of daily living as described to Ms. Smith, and the opinion of the state agency consultant, Dr. Smith. Specifically, Dr. Smith gave no weight to the finding of a markedly deficient recent memory based on the cognistat and the claimant's activities of daily living (Exhibit 16F, p. 13). The ALJ adopts Dr. Smith's opinion based on her specific knowledge of Social Security Rules and Regulations and her unique perspective based on her review of the entire record (Exhibit 16F). At a recent office visit with her treating physician, the claimant denied any memory difficulties (Exhibit 22F, p. 2). Her mood and affect were normal and appropriate (Exhibit 22F, p. 3). Her treating physician also commented on her mental status in the visit of November 21, 2006 and stated that the claimant had memory intact and immediate recall intact - long term memory intact (Exhibit 22F, p. 20). Also, the ALJ has taken into consideration records from Mark Casdorph, D.O., a psychiatrist who treated the claimant from March 1, 2006 through July 20, 2006. The claimant alleges diabetes but she has no end organ or visual damage or neuropathy due to diabetes (Exhibit 7F)... 4. From the alleged onset date to the present, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). X-rays taken on August 21, 2006 showed mild degenerative changes of both knees (Exhibit 22F, p. 4). The claimant was evaluated by Robert Ghiz, M.D., on September 6, 2006 and October 25, 2006 for a complaint of bilateral knee pain. She walked without a limp, had full range of motion of both knees and equal quadriceps size... There is no documentation in the medical evidence of record of any gross anatomical deformity, chronic joint pain and stiffness, findings on appropriate medically acceptable imaging or inability to ambulate effectively. These findings are consistent with the claimant's residual functional capacity.

(Tr. at 20-22.)

The conclusions drawn by the ALJ are reasonable, and the court can find no material misstatement by the ALJ in his findings.

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin, Chief Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th

Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984).   Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

  August 5, 2009
      Date

                Mary E. Stanley
                United States Magistrate Judge